UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

            v.

CLIFFORD BILLINS,

                        Defendant.
_____

REPORT & RECOMMENDATION

19-CR-6054G

## PRELIMINARY STATEMENT

By Order of Hon. Frank P. Geraci, Jr., Chief United States District Judge, dated April 12, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 139).

On April 11, 2019, the grand jury returned an eight-count indictment charging Clifford Billins a/k/a Billz ("Billins") and four other defendants with various narcotics offenses. (Docket # 137).  Billins is charged in Count One with conspiring with the co-defendants from March 2018 through August 2018 to possess with intent to distribute fentanyl, cocaine base, and heroin, in violation of 21 U.S.C. § 846.  (*Id.*).  He is not charged in the other counts.  (*Id.*).

Currently pending before the Court is a motion by Billins to suppress statements and tangible evidence seized pursuant to a search warrant (Docket # 172 at ¶¶ 55-65) and to suppress evidence obtained pursuant to court-authorized wiretaps (*id.* at ¶¶ 66-82).[1]  For the reasons discussed below, I recommend that the District Court deny Billins's motion to suppress

_____

[1] Billins's omnibus motion sought a variety of other relief.  (Docket # 172).  Those other applications were decided by the undersigned or resolved by the parties in open court on June 19, 2019.  (Docket # 181).

statements and tangible evidence seized pursuant to the search warrant. As to Billins's motion to suppress wiretap evidence, I find that he has not adequately established that he has standing to challenge the wiretaps at issue; he may submit a supplemental affidavit to make such a showing by no later than **July 31, 2019**.

**DISCUSSION**

I.    **Motion to Suppress Search Warrant Evidence and Statements**

A.    **Factual Background**

On August 13, 2018, the Honorable Victoria M. Argento ("Argento"), Monroe County Court Judge and Acting New York State Supreme Court Justice, issued a warrant to search 911 Mary Street in Utica, New York. (Docket # 177-1 at 2-4). In addition to authorizing a search of the premises, the warrant also authorized a search of Billins and any cell phone in his possession. (*Id.* at 2). The warrant indicated that the "property sought to be seized [was] evidence of the Crime(s) Criminal Possession of a Controlled Substances, in violation of sections and subsections 220.00 of the Penal Law of the State of New York" and authorized the seizure of, *inter alia*, "[h]eroin, fentanyl and cocaine and any such evidence which tend[ed] to demonstrate that a drug related offense was committed or that a particular person participated in the commission of such offense." (*Id.* at 2).

John Brennan ("Brennan"), an investigator employed by the Rochester Police Department's Major Crimes Unit, submitted an affidavit in support of the search warrant, sworn to on August 6, 2018 (hereinafter, the "Brennan Affidavit" or "Brennan Aff."). (Docket # 172 at 41-76). In his affidavit, Brennan stated that he has been a police officer since December 1982 and has been assigned to the Major Crimes Unit since 2011. (Brennan Aff. at ¶¶ 10, 12).

2

Brennan explained that since August 2016 he was involved in an investigation of the "illegal and drug activities" of Michael Wyatt ("Wyatt") and Andre Cunningham ("Cunningham") (two of Billins's co-defendants), as well as others "who have or [were] assisting [Wyatt and Cunningham] in selling heroin, fentanyl and cocaine." (*Id.* at ¶ 15). The subsequently-filed criminal complaint refers to the group as the "Wyatt Drug Trafficking Organization" or the "Wyatt DTO." (*See* Docket ## 1 at ¶ 7; 172 at ¶ 6; 177 at 13).[2]

During the course of the investigation, on June 29, 2018, Argento issued an eavesdropping warrant for a cell phone number associated with Wyatt. (Brennan Aff. at ¶ 107). A call was subsequently intercepted between Wyatt and a male using cell phone number (585) 953-9635 on July 3, 2018. (*Id.* at ¶ 110). In his warrant affidavit, Brennan explained that during that call, Wyatt asked the male "when he was coming," and the male responded that "his people wo[uld not] be ready until after 11:00 and he ha[d] to show up to the 'cuse.'" (*Id.*). Wyatt replied that "they are going crazy and he need[ed] him ASAP." (*Id.*). Based on Brennan's training, experience, and knowledge of the investigation, he interpreted this conversation to mean that Wyatt was running low on drugs and was looking for drugs from the other male, who told Wyatt he had to go to Syracuse, New York. (*Id.* at ¶ 111). Brennan also explained that a "check of the records of the Rochester Police Department" showed that the cell phone number (585) 953-9635 was used by Ulises Vargas ("Vargas"). (*Id.* at ¶ 113).

---

[2] The vast majority of the Brennan Affidavit describes efforts undertaken as part of the investigation into the Wyatt DTO. These efforts included conducting several controlled purchases using multiple confidential informants, surveilling the activities of individuals associated with the Wyatt DTO, and obtaining eavesdropping warrants for cell phone numbers associated with individuals believed to be involved in the Wyatt DTO, through which conversations and text messages were intercepted. (*See generally* Docket # 172 at 41-76). Approximately ten of the more than two hundred paragraphs in the affidavit pertain directly to Billins and 911 Mary Street in Utica, New York. For purposes of Billins's motion to suppress evidence seized pursuant to the search warrant, the Court recounts only the most relevant portions of the Brennan Affidavit.

Brennan summarized a call between Wyatt and Vargas on July 3, 2018, in which Wyatt was "making arrangements to meet with [Vargas]" on "dale." (*Id.* at ¶ 114). Brennan interpreted this conversation to mean that they planned to meet on Glendale Park "in order for [Wyatt] to purchase drugs." (*Id.* at ¶ 115). Surveillance established on Glendale Park revealed that Wyatt and a car registered to Vargas met at 133 Glendale Park, after which Wyatt drove to and entered 218 Emerson Street. (*Id.* at ¶ 116). Argento subsequently issued an eavesdropping warrant for Vargas's cell phone number (585) 953-9635. (*Id.* at ¶ 133).

On July 9, intercepted conversations revealed that Wyatt told Vargas, "I need to get with you," and Vargas told Wyatt that he could meet Wyatt in two to three hours. (*Id.* at ¶ 138). Later that day, Wyatt told Vargas that he was at the Diplomat Hotel, located at 1956 Lyell Avenue in Rochester, New York, and Vargas agreed to meet Wyatt at that location. (*Id.* at ¶ 139). Brennan explained that surveillance revealed that Wyatt and Vargas met there, and he opined that the purpose of the meeting was for Vargas to supply Wyatt with drugs. (*Id.* at ¶¶ 141-42).

That same day, Vargas exchanged text messages with phone number (718) 650-9864. (*Id.* at ¶ 143). According to Brennan, the person using that phone number texted Vargas, "Came across white but not enough [un]til tomorrow." (*Id.*). Vargas responded, "Dam, need you bad[,]" and the person using (718) 650-9864 replied, "ok." (*Id.*). Several minutes later, the individual using (718) 650-9864, who was a male not yet identified by the investigating officers, called Vargas and stated, "I came across the right shit, but there wasn't a lot of it bro." (*Id.* at ¶ 144). Vargas responded, "Dam, [s]o how long you, you, go[ing to] be?" (*Id.*). The male responded, "like tomorrow probably[,]" and Vargas replied, "go[ing to] shoot out there in the morning." (*Id.*).

4

The following day, on July 10, 2018, Vargas received a call from (718) 650-9864.

(*Id.* at ¶ 145).  Brennan summarized this conversation:

> In summary, Vargas is told by the male that "son went bro, he went, I'm waiting for him to come back," "he down there now." They then discuss on how and where they are going to meet.  The male tells him he has to come to Rochester and then tells Vargas I wish he had known Vargas would be coming because he needed something.  He tells Vargas "[w]ish I had known, cause I had son- had son- gave ya like six five to me.  Ya know what I'm saying."

(*Id.* at ¶ 145).  Based on Brennan's training, experience and knowledge of the investigation, he opined that the male using (718) 650-9864 was located outside the Rochester area and was "a source of drugs for Vargas, however[,] it [was] unknown what type of drug at th[at] time he [was] supplying Vargas."  (*Id.* at ¶ 146).  Brennan affirmed that "[d]uring [a] series of calls[,] [the male] tells Vargas he would have him bring something from Rochester to him[,] [but] [i]t [was] unknown what type of drug he [was] looking for Vargas to bring to him."  (*Id.*).  Brennan explained that based on his training, experience and knowledge of the investigation, it was "not uncommon for drugs dealers to use other sources for different types of drugs."  (*Id.*).

Brennan further summarized a series of calls between (718) 650-9864 and Vargas on July 12, 2018:

> In summary, Vargas and the male [made] arrangements to meet.  It is believed he is in Utica, New York.  It was decided Vargas would meet the unknown male halfway.  The location they decided on was the mall, believed to be the mall in Syracuse, New York.  The unknown male during a series of calls arranged to have Vargas to bring something to him.  The conversations suggested the male wanted Vargas to bring him cocaine.  Vargas later during the night told him he wouldn't be traveling until the next day.

(*Id.* at ¶ 156).

On the morning of July 13, 2018, Vargas called (718) 650-9864.  (*Id.* at ¶ 157).
According to Brennan, "Vargas [was] asked 'Yo, Bub, the one that you got, was it, was it, one you showed me?[]  The one you told me about?[']  Vargas responded 'What, UM, yeah, yeah. The power.[']  The male then tells Vargas alright he just wanted to make sure."  (*Id.*).  Based on Brennan's training and experience, he concluded that the male using (718) 650-9864 wanted Vargas to bring him cocaine.  (*Id.*).

> Brennan affirmed:
>
> On July 13, 2018 surveillance followed Vargas to several locations in Rochester and at approximately 4:55 PM Vargas was observed leaving the Rochester area.  He was followed to the Destiny Mall in Syracuse, New York where he was observed parking his vehicle at 5:40 PM.  A male black then pulled up in a 2009 Chrysler bearing New York registration ARP-6760, registered to Andrea Taylor, 1643 Elm Street, Utica, New York and entered into Vargas's vehicle.  Once the meeting was finished Vargas headed back to Rochester, New York.  The surveillance continued surveillance on the male.  The male was observed entering into the mall and returning with a male and female.  They all left in the Chrysler, the male now as a passenger.  The surveillance team followed the vehicle onto the New York State Thruway and eventually had the vehicle stopped to identify the male black.  The male was identified as Clifford Billins, 03/22/1979.  He provided an address of 107 Salisbury Street, Rochester, New York.

(*Id.* at ¶ 158).[3]  Brennan also stated:

> A check of the records of Utica Police Department show Clifford Billins had been arrested on June 9, 2018 in the City of Utica for driving without a license.  He was stopped in the vehicle with Tynnia Hopkins, 04/24/1989, 911 Mary Street, Utica, New York. During his arrest he provided an address of 107 Salisbury Street, Rochester, New York.  This address is known to be his parents['] address.  The Utica Police also provided a tip they received on

---

[3]  Billins points out that the Destiny Mall meeting actually occurred on July 12, 2018, not July 13, 2018. (Docket # 172 at ¶ 62 n.2).  The government indicates that "a ministerial error was made" and that the conversations between Billins and Vargas alleged in the Brennan Affidavit to have occurred on July 12 and the Destiny Mall meeting alleged to have occurred on July 13 "took place one day earlier than described."  (Docket # 177 at 18 n.1 ("[i]n other words the conversations on the 12th to set up the meeting took place on July 11th, and the meeting, as observed by the surveillance team, took place on July 12th")).

> June 7, 2018 in which a caller stated Clifford Billins and Tynnia Hopkins [were] selling cocaine in Utica, New York and were heading to the New York Thruway to meet someone to make a purchase. The caller provided their address as 911 Mary Street, First floor.

(*Id.* at ¶ 159).

On August 4, 2018, Vargas called (646) 573-4018, a number that Brennan indicated was used by Billins. (*Id.* at ¶ 211). According to Brennan, "Vargas ha[d] been communicating with Billins for the last few days to arrange a meet for Vargas to buy drugs." (*Id.*). Brennan summarized one such call on August 2, 2018: "In this call Vargas [was] asking Billins to meet him in Syracuse. Billins t[old] him he can't because he [was] not driving. Vargas then t[old] him he will come to Utica." (*Id.*). Brennan explained that "[i]n two prior text messages dated July 21 and August 2, 2018 Billins provided his address as 911 Mary Street." (*Id.*). Brennan stated that "[t]he cellular phone records were examined and show Vargas did travel to Utica, [New York] on August 5, 2018 and was in the area of 911 Mary Street from 2:17 AM to 3:15 AM." (*Id.*). Based on Brennan's training, experience and participation in the investigation, he concluded that Vargas was using Billins as "one of his sources for drugs and travelled to 911 Mary Street and met with [Billins] to obtain drugs to bring back to the Rochester area to sell." (*Id.* at ¶ 212). He further opined in his affidavit that the evidence developed in the investigation had identified Billins, Vargas, Wyatt, Cunningham and other individuals as being involved "in the distribution and selling of illegal drugs in the City of Rochester, New York." (*Id.* at ¶ 214).

The search warrant was issued on August 13, 2018, and executed the next day. (Docket ## 172 at ¶ 58; 177-1 at 3). On that date, officers with the Utica Police Department stopped a vehicle in which Billins was a passenger and "later searched [it] pursuant to the search

warrant." (Docket # 172 at ¶ 59). According to Billins's motion papers, "[a] cellular phone and a quantity of marijuana was secured from the vehicle and another cellular phone was secured [from] the person of Clifford Billins[;] [s]imultaneously, [Billins's] residence at 911 Mary Street was searched[,] [and] [n]umerous items were seized from that apartment, including marijuana, heroin and cocaine." (*Id.*). Billins seeks to suppress the seized evidence based on the allegedly deficient search warrant, as well as "any statements taken from [Billins] following the execution" of the warrant as fruit of the defective warrant. (*Id.* at ¶ 65).

**B.**   **Analysis**

**1.**   **Standing**

The government contests Billins's standing to challenge the search of 911 Mary Street on the grounds that he has not established that he had an expectation of privacy in the premises searched. (Docket # 177 at 14-15). Prior to oral argument, Billins submitted an affidavit, sworn to on June 13, 2019, indicating that "[a]t the time of [his] arrest [on] August 14, 2018, [he] resided in the first floor apartment at 911 Mary Street in Utica, New York." (Docket # 178 at 2, ¶ 2). Billins further affirmed that "911 Mary Street was [his] home for several months, having moved to th[at] location in early 2018." (*Id.* at ¶ 3). At oral argument, the government conceded that Billins's affidavit "arguably establishes standing." (Docket # 180 at 9:59:40-9:59:58).

I find that the affidavit submitted by Billins sufficiently demonstrates his standing to challenge the warrant. *See*, *e.g.*, *United States v. Taylor*, 1992 WL 249969, *9 (S.D.N.Y. 1992) ("[s]ince the government filed its brief, however, the defendant has submitted an affidavit stating that 6 Berkeley Avenue has been his residence since 1986[;] . . . [defendant] has therefore made the necessary showing of a legitimate expectation of privacy[;] [a]ccordingly, the [c]ourt

must consider [defendant's] arguments that the warrants were defective and determine whether there was probable cause to issue them").

### 2.   **Probable Cause**

Billins argues that the search warrant for 911 Mary Street was not supported by probable cause and that the evidence seized during the execution of that warrant thus should be suppressed.  (Docket # 172 at ¶¶ 55-65).  Billins maintains that "[a]lthough the investigation established that [he] resided at [911 Mary Street], he was never observed leaving 911 Mary Street to buy/purchase narcotics, he was never observed engaging in the sale or manufacture of narcotics at 911 Mary Street and, most importantly, no drugs were ever seized and/or tested subsequent to any alleged meetings between co-Defendant [Vargas] and [Billins]."  (*Id.* at ¶ 63).  In essence, Billins contends that the Brennan Affidavit does not demonstrate a nexus between Billins's alleged involvement in the Wyatt DTO and his residence at 911 Mary Street.  (*Id.*).  Billins also argues that the good faith exception does not apply to this case.  (*Id.* at ¶ 64).

The government responds that the Brennan Affidavit provides "significant factual allegations" connecting Billins to the Wyatt DTO and establishes a nexus between these activities and 911 Mary Street.  (Docket # 177 at 16).  The government also maintains that even if the warrant affidavit had failed to establish probable cause, suppression would still be inappropriate because the executing officers had relied on the search warrant in good faith.  (*Id.* at 20-21).

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the

"totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for . . . conclud[ing]' that probable cause existed."  *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases . . . should be largely determined by the preference to be afforded to warrants."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

I conclude that the information contained in the Brennan Affidavit provided probable cause for the warrant to search 911 Mary Street.  As an initial matter, the Brennan Affidavit adequately alleges Billins's connection to 911 Mary Street.  (*See* Docket # 172 at ¶ 63 ("the investigation established that Clifford Billins resided at [911 Mary Street]")).  Brennan affirmed that on June 9, 2018, Billins had been stopped and arrested in the City of Utica for driving without a license and Tynnia Hopkins, whose address was 911 Mary Street, was in the car with him.  (Brennan Aff. at ¶ 159).  Moreover, the Utica Police Department "also provided a tip they received on June 7, 2018 in which a caller reported that Clifford Billins and Tynnia Hopkins [were] selling cocaine in Utica, New York" and that their address was "911 Mary Street, First floor."  (*Id.*).

10

Although this anonymous tip, standing alone, would have been insufficient to support a warrant for 911 Mary Street, the Brennan Affidavit contains additional corroborative information.  *See United States v. Fama*, 38 F. App'x 70, 72 (2d Cir. 2002) ("[a]nonymous tips suffice to establish probable cause if they are corroborated by independent police work"); *United States v. Schmidt*, 2012 WL 3686645, *3 (W.D.N.Y.) ("[a]nonymously supplied information can be a factor supporting probable cause where the information is 'sufficiently corroborated'") (quoting *United States v. Elmore*, 482 F.3d 172, 180 (2d Cir. 2007)), *report and recommendation adopted by*, 2012 WL 3686176 (W.D.N.Y. 2012).  Significantly, Brennan indicated that "Billins provided his address as 911 Mary Street" in two text messages intercepted on July 21 and August 2, 2018.  (Brennan Aff. at ¶ 211).  In addition, Brennan summarized and interpreted an August 4, 2018 call between Billins and Vargas in which Vargas told Billins that he would come to Utica to buy drugs.  (*Id.*).  According to Brennan, "[t]he cellular phone records were examined and show[ed] Vargas did travel to Utica, [New York] on August 5, 2018 and was in the area of 911 Mary Street from 2:17 AM to 3:15 AM."  (*Id.*).  Considering the totality of these allegations, I find that the Brennan Affidavit sufficiently linked Billins to 911 Mary Street.

Billins further contends that the Brennan Affidavit fails to establish probable cause that evidence of drug dealing associated with the Wyatt DTO would be found at 911 Mary Street.  In "determining whether probable cause exists to justify a search, the [c]ourt must look for a reasonable nexus between the criminal activities described in the warrant application and the place to be searched."  *United States v. Nix*, 2016 WL 11268960, *4 (W.D.N.Y. 2016), *report and recommendation adopted by*, 2017 WL 65329 (W.D.N.Y. 2017).  "A showing of nexus does not require direct evidence and may be based on reasonable inference from the facts

presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (citations and quotations omitted).

In his affidavit, Brennan affirmed that intercepted communications, corroborated by surveillance, revealed that Wyatt and Vargas met on multiple occasions for Wyatt to buy drugs from Vargas. For example, according to Brennan, Wyatt told Vargas on July 3, 2018, that "he need[ed] [Vargas] ASAP." (Brennan Aff. at ¶ 110). Later that day, they apparently made plans to meet on Glendale Park (*id.* at ¶¶ 114-15), and Wyatt and Vargas were later observed on that street (*id.* at ¶ 116). Wyatt and Vargas also made plans to meet on July 9, 2018, after Wyatt told Vargas, "I need to get with you"; during that call, Vargas asked Wyatt for the "verdict," and Wyatt responded that he "didn't get nothing bad." (*Id.* at ¶ 138). Brennan summarized calls between Wyatt and Vargas on July 9, 2018, discussing plans to meet at 1956 Lyell Avenue, and they were subsequently observed there later that day. (*Id.* at ¶¶ 139-41).

Brennan described a text message exchange on July 9, 2018, between Vargas and cell phone number (718) 650-9864, which was being used by a male whose identity was not known at that time by the investigators. The male texted Vargas, "Came across white but not enough till tomorrow," to which Vargas responded "Dam, need you bad." (*Id.* at ¶ 143). Brennan reported that the "[m]ale responded 'ok.'" (*Id.*). Twelve minutes later, the male called Vargas. (*Id.* at ¶ 144). The male told Vargas, "I came across the right shit, but there wasn't a lot of it bro," and Vargas responded, "Dam, [s]o how long you, you, gonna be?" (*Id.*). The male responded, "like tomorrow probably," and Vargas told him he would "shoot out there in the morning." (*Id.*).

The following day, the male called Vargas. (*Id.* at ¶ 145). According to Brennan, the male told Vargas, "son went bro, he went, I'm waiting for him to come back," "he down

there now." (*Id.*). Brennan stated that Vargas and the male "then discuss[ed] . . . how and where they [were] going to meet." (*Id.*). The male told Vargas that he had "to come to Rochester" and "wish[ed] he had known Vargas would be coming because he needed something." (*Id.*). Specifically, the male told Vargas, "[w]ish I had known, cause I had son- had son- gave ya like six five to me[;] [y]a know what I'm saying." (*Id.*).

Based on Brennan's training, experience and knowledge of the investigation, he opined that the male using (718) 650-9864 was "located outside the Rochester area and [was] a source of drugs for Vargas[.]" (*Id.* at ¶ 146). Brennan acknowledged that he did not know, however, "what type of drug . . . [the male] [was] supplying Vargas." (*Id.*). Brennan also did not know the type of drug the unknown male was "looking for Vargas to bring to him," but stated that "it [was] not uncommon for drug[] dealers to use other sources for different types of drugs." (*Id.*).

Brennan later concluded that Billins was the individual using (718) 650-9864 and detailed the basis for the belief. His affidavit indicated that a "series of calls were exchanged between (718) 650-9864 and [Vargas]" on July 12, 2018. (*Id.* at ¶ 156). Without providing any excerpts of these conversations, Brennan averred that Vargas and the male made "arrangements to meet" and that it was "believed [the male] [was] in Utica." (*Id.*). According to Brennan, Vargas and the male apparently decided to meet "halfway" at "the mall," which Brennan believed to be "the mall in Syracuse, New York." (*Id.*). Brennan further stated that the "unknown male during a series of calls arranged to have Vargas to bring something to him," and the conversations "suggested the male wanted Vargas to bring him cocaine." (*Id.*). According to Brennan, "Vargas later during the night told [the male] he wouldn't be traveling until the next day." (*Id.*).

13

The following day, Vargas called (718) 650-9864 and spoke to the male. (*Id.* at ¶ 157). According to Brennan, the male asked Vargas, "Yo, Bub, the one that you got, was it, was it, one you showed me?[] The one you told me about?" (*Id.*). Vargas responded, "What, UM, yeah, yeah[;] [t]he power[,]" to which the male responded that he just wanted to make sure. (*Id.*). Based on Brennan's training and experience, he concluded that Vargas was bringing cocaine to the male. (*Id.*).

Later that day, surveillance observed Vargas leaving the Rochester area and traveling to the Destiny Mall in Syracuse, New York. (*Id.* at ¶ 158). At the mall, a male was observed entering Vargas's vehicle. (*Id.*). Brennan explained that after the meeting concluded, Vargas traveled back to Rochester, and the male who had met with Vargas was observed leaving the mall as a passenger in a vehicle with two other people. (*Id.*). That vehicle was eventually stopped by law enforcement on the New York State Thruway "to identify the male black" who had met with Vargas. (*Id.*). The male was identified as Billins, who provided an address of 107 Salisbury Street, Rochester, New York. (*Id.*).[4]

Brennan also summarized an August 4, 2018 call between Vargas and Billins, who was apparently using a different cell phone number from the one used during the July communications with Vargas. (*Id.* at ¶ 211). Without providing any excerpts of intercepted conversations, Brennan affirmed, "[i]n summary, Vargas ha[d] been communicating with Billins for the last few days to arrange a meet for Vargas to buy drugs." (*Id.*). According to Brennan, during the August 4, 2018 call, "Vargas [was] asking Billins to meet him in Syracuse," but Billins replied that he could not "because he [was] not driving." (*Id.*). According to Brennan,

---

[4] Billins argues that it is "notable that the vehicle Clifford Billins was riding in was stopped by the New York State Police returning to Utica for purposes of identifying him and no drugs were observed or seized during this unlawful stop." (Docket # 172 at ¶ 62). The proffered purpose of the stop, however, was to identify the male who had met with Vargas, and the record does not show that the vehicle was searched.

Vargas then told Billins he would come to Utica. (*Id.*). Phone records revealed that Vargas traveled to Utica on August 5, 2018, "and was in the area of 911 Mary Street from 2:17 AM to 3:15 AM." (*Id.*). Based on Billins's training, experience and participation in the investigation, he opined that "Vargas [was] using [Billins] as one of his sources for drugs and travelled to 911 Mary Street and met with [Billins] to obtain drugs to bring back to the Rochester area to sell." (*Id.* at ¶ 212).

The lack of specificity in Brennan's summary of certain intercepted communications between Billins and Vargas, particularly the absence of quoted or excerpted portions of those communications, makes my assessment of probable cause more difficult. Most significantly, Brennan did not specify the basis for his conclusion that "Vargas ha[d] been communicating with Billins [in late July and early August] to arrange a meet[ing] for Vargas to buy drugs." (*Id.* at ¶ 211). The absence of a detailed or fuller description of these conversations hampers the Court's ability to independently assess the reasonableness of Brennan's interpretations of the communications.

Although inclusion of such information would have been the better practice, Brennan's failure to have done so does not invalidate the warrant. *See United States v. Jiminez*, 224 F.3d 1243, 1248-49 (11th Cir. 2000) ("[w]hile it would perhaps have been preferable for the affidavit to have detailed some particular phone conversations, the affidavit states that those phone conversations 'indicate that' various drug activities were taking place; this is an objective presentation of the information gained by the investigating officers"), *cert. denied*, 534 U.S. 1043 (2001); *Lebowitz v. United States*, 2015 WL 630394, *5 (N.D. Ga. 2015) ("[a]n affiant is allowed to summarize objective evidence from an investigation, as was done here"); *United States v. Welch*, 2007 WL 119954, *2 n.2 (E.D. Pa. 2007) ("[t]o the extent that [defendant]

15

additionally argues that it was erroneous for the [issuing judge] to make a determination of probable cause in the absence of a holistic review of the actual transcripts of the telephone calls, this argument must fail[;] [t]he [g]overnment had no affirmative obligation to produce the transcripts, and it is the province of the [issuing judge] to determine whether probable cause exists based on the totality of the circumstances").  Here, Brennan's affidavit included quotations and excerpts of other drug-related communications between Billins and Vargas, information about surveillance of Vargas and Billins meeting at the Destiny Mall that was consistent with Brennan's interpretations of earlier communications, and information that Vargas was in the vicinity of 911 Mary Street in Utica, New York, from 2:17 AM to 3:15 AM on August 5, 2018.  Taken together, Brennan's assertions, which included his summary of the intercepted conversations, surveillance observations, and information obtained from phone records, provided probable cause to believe that Billins resided at 911 Mary Street and that evidence of narcotics trafficking would be found there.  *See United States v. Singh*, 390 F.3d at 182.

Accordingly, I recommend that the District Court deny Billins's motion to suppress tangible evidence seized during the execution of the warrant.  I also recommend denial of his motion to suppress statements made during the execution of the search warrant on the grounds that they constitute fruit of the unlawful warrant.[5]

### 3.    Application of the Good Faith Exception

In any event, nothing in the record suggests that the officers who executed the search warrant did not rely upon the search warrant in good faith.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment exclusionary rule should

---

[5] At oral argument, defense counsel confirmed that the only basis on which Billins sought suppression of statements was that they were obtained as fruit of the allegedly defective warrant.  (Docket # 180 at 10:02:34-10:03:40).

not be applied to evidence obtained by a police officer whose reliance on a search warrant issued

by a neutral magistrate was based on "objective good faith," even though the warrant itself might

ultimately be found to be defective.  *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114

(2d Cir. 1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d

175, 182 (W.D.N.Y. 2000).  The rationale underlying this good faith exception is that the

exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable

law enforcement activity."  *United States v. Leon*, 468 U.S. at 919.

   The Court in *Leon* identified four situations in which the good faith exception is

inapplicable.  Specifically, an executing officer's reliance on a search warrant will not be deemed

to have been in good faith:

> (1)  where the issuing magistrate has been knowingly misled;
>
> (2)  where the issuing magistrate wholly abandoned his or her judicial role;
>
> (3)  where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and
>
> (4)  where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted); *see Leon*, 468

U.S. at 923.

   In this case, nothing in the record supports a suggestion that Argento was

knowingly misled or abandoned her judicial role in authorizing the challenged warrant.  Billins's

argument to the contrary is speculative and without merit.  (*See* Docket # 172 at ¶ 64 ("[g]iven

the large number of search warrant applications (at least 8) presented to Justice Argento in early

August 2018, it is likely that, seeing that the applications for the various locations were identical,

the court failed to perform its neutral and detached function by examining each application on

the merits, and instead served as a rubber stamp for the law enforcement") (quotations omitted)).

Moreover, for the reasons explained in detail above, the warrant here cannot be said to have been

so facially deficient or so lacking in probable cause that reliance upon it was objectively

unreasonable. Accordingly, I recommend, in the alternative, that the District Court uphold the

challenged search warrant under *United States v. Leon*, 468 U.S. 897 (1987).


## II.    <u>Motion to Suppress Wiretap Evidence</u>

### A.    <u>Factual Background</u>

During the investigation, Argento issued wiretap orders for two of Vargas's cell

phone numbers, which are the subject of Billins's motion. (Docket ## 177-2, 177-3, 177-4).

The first wiretap order, which related to Vargas's phone number (585) 953-9635, was issued on

July 6, 2018, and subsequently extended by order dated August 3, 2018. (*See* Docket ## 177-4,

177-3). Both of those orders were supported by affidavits submitted by Brennan. (*Id.*). The

second wiretap order concerned Vargas's phone number (585) 441-5534 and was issued on July

27, 2018. (Docket # 177-4). That order was supported by the affidavit of Rochester Police

Investigator Gary Galetta. (*Id.*). None of the applications at issue mention Billins, conversations

with him, or cell phone numbers associated with him. (*See generally* Docket ## 177-2, 177-3,

177-4).

### B.    <u>Analysis</u>

Billins claims that the applications submitted in support of the wiretap warrants

did not comply with 18 U.S.C. § 2518(1)(c) because they "failed to establish specific, detailed

reasons why normal investigative procedures failed, were unlikely to succeed, or were too

dangerous to employ" and that the wiretaps thus "were procured without an adequate showing

that traditional investigative means were exhausted." (Docket # 172 at ¶¶ 75, 82). Billins seeks suppression of the "fruits of those [unlawful] interceptions." (*Id.* at ¶ 82).

In addition to arguing that the applications "more than adequately explained the reasons that traditional investigative techniques would not [have] be[en] sufficient to successfully investigate the [Wyatt DTO]" (Docket # 177 at 23, 26-33), the government also maintains that Billins has "failed to establish standing to challenge the sufficiency of any of [the] eavesdropping applications or orders in issue" (*id.* at 24). In the government's view, "[a]bsent sworn evidence establishing [Billins's] expectation of privacy in the intercepted communications, [his] motion to suppress tangible evidence flowing from these orders or applications must be denied." (*Id.*). I agree with the government.

Under 18 U.S.C. § 2518(10), an aggrieved person may "move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a). An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). As the Second Circuit has recognized, a person "who has had his conversations intercepted during the wiretap" is an aggrieved person under the statute. *United States v. Fury*, 554 F.2d 522, 525 (2d Cir.), *cert. denied*, 433 U.S. 910 (1977).

A defendant may establish standing as an aggrieved person in two ways. *See United States v. Rodriguez*, 2009 WL 2569116, *4 (S.D.N.Y. 2009). "First, a defendant can submit 'sworn evidence, in the form of affidavit or testimony, from the defendant or someone

with personal knowledge' establishing that it was the defendant's voice that was captured on the wiretap." *Id.* (quoting *United States v. Montoya-Eschevarria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995)).  "Second, defendants who are named targets or interceptees of a wiretap automatically have standing under Title III."  *Id.*  "The burden of establishing standing is on the party moving to suppress evidence."  *Id.* (citing *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991)).

Here, Billins is neither a named target nor a named interceptee in the wiretap applications submitted by Brennan and Investigator Galetta.  *See United States v. Rodriguez*, 2009 WL 2569116 at *5 ("[t]he term 'named interceptee' refers to targets listed on the initial application for a wiretap").  Rather, Billins asserts that he is an "aggrieved person" because "[d]uring the period of time from July 7, 2018, to August 4, 2018, there were 20 calls intercepted between [Vargas's] target numbers and Clifford Billins' mobile numbers of (718) 650-9864 and (646) 573-4018."  (Docket # 172 at ¶ 68).  Billins claims that "[h]e had a reasonable expectation of privacy in the overheard conversations in which he was a participant" and therefore has "standing to challenge the legality of the court-ordered interceptions."  (*Id.* at ¶ 69).

Because Billins does not have standing to challenge the wiretap orders as a named target or interceptee, he bears the burden "to demonstrate standing by submitting sworn evidence, by affidavit or testimony, from [himself] or someone with personal knowledge, establishing that it was [his] voice that was intercepted on the wiretap."  *United States v. De Leon-Navarro*, 2012 WL 3313536, *2 (W.D.N.Y.) ("this defendant was not a named target or interceptee on any of the Title III interception orders at issue in this case[;] . . . [a]s defendant has failed to aver that his voice was intercepted, it is recommended that his motion to suppress be denied for lack of standing"), *report and recommendation adopted by*, 2012 WL 3315731 (W.D.N.Y. 2012); *Rodriguez*, 2009 WL 2569116 at *5 (rejecting defendant's argument that he

20

had standing to challenge wiretap warrant based on the government's representation in search

warrant affidavit submitted after initial wiretap application that wiretap captured defendant's

voice "discussing an upcoming narcotics delivery"; "as . . . [d]efendant was [not] a named target

of the initial September 13, 2007 wiretap application and . . . [d]efendant ha[d] [not] conceded

that it [was] his voice on the recordings, [d]efendant ha[d] [no] standing to challenge the

admissibility of the challenged wiretaps"); *United States v. Bellomo*, 954 F. Supp. 630, 639-40

(S.D.N.Y. 1997) ("[a]s a threshold matter, [defendant] lacks standing to make this motion [to

suppress] as to the initial wiretap application[;] . . . [defendant] does not admit that he was

intercepted on [co-defendant's] cellular phone[;] [h]e was neither a target nor a named

interceptee in the initial application[;] [t]he disputed allegations of the government, or the claim

by [defendant's] attorney that [defendant] often spoke with [co-defendant] on the phone, do not

establish a sufficient interest in the interceptions for [defendant] to have standing[;] [h]e must

establish that his voice was intercepted[;] [a]bsent a sworn statement by [defendant] or someone

with personal knowledge averring that [defendant's] voice was intercepted on the cellular phone,

he lacks standing to seek suppression of the evidence that the wiretap on that phone produced[;]

[defendant's] motion to suppress the fruits of the initial order therefore is denied").

　　　　　Billins has not made the requisite showing that his voice was, in fact, overheard

on the wiretaps at issue to establish standing to challenge the lawfulness of those wiretaps.  To be

certain that Billins has had a fair opportunity to do so, he may file a supplemental affidavit of

himself or someone with personal knowledge averring that his voice was intercepted through the

wiretap warrants at issue.  *See*, *e.g.*, *United States v. Bailey*, 2016 WL 6082239, *1, 9 (W.D.N.Y.

2016) (allowing defendant to submit supplemental affidavit to address his standing to challenge

wiretap warrants and finding that supplemental affidavit "adequately demonstrate[d] . . . that

[defendant] ha[d] standing to move to suppress communications intercepted over the[] target numbers"; "[t]he charges against [defendant] resulted from a lengthy investigation that included interception of communications between various individuals pursuant to multiple wiretap orders[;] . . . [o]n April 18, 2016, [defendant] submitted an affidavit to address his standing to challenge particular wiretaps, including the three wiretaps identified above[,] . . . [and has] stat[ed] that he was intercepted over the three wiretap orders"). In the event that no such affidavit is submitted by **July 31, 2019**, this Court will recommend denial of Billins's motion to suppress wiretap evidence on the grounds that he has not established standing to challenge the wiretap warrants.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the District Court deny Billins's motion to suppress statements and tangible evidence seized pursuant to the search warrant. (Docket # 172). In addition, any supplemental affidavit that Billins wishes to submit to establish that he has standing to challenge the wiretaps at issue must be filed by no later than **July 31, 2019**.

**IT IS SO ORDERED.**

                                                            *s/Marian W. Payson*
                                                            MARIAN W. PAYSON
                                                            United States Magistrate Judge

Dated: Rochester, New York
           July 17, 2019

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      July 17, 2019

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).